**FILED**

August 24, 2009

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002043888

LAW OFFICES OF TODD A. MURRAY
Todd A. Murray, Esq. (CA State Bar #75364)
1050 Fulton Avenue, Suite 218
Sacramento, California 95825
Telephone: (916) 488-1795
Facsimile: (916) 481-5080

Attorney for Plaintiff
BRUCE FOX dba FOX MEDIA

## UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF CALIFORNIA
### (Sacramento Division)

| | |
|---|---|
| In re | Case No. 04-26255-B-7 |
| | Case No. 04-26256-B-7 |
| PONCE NICASIO BROADCASTING, INC., | |
| Debtor. | |
| Bruce Fox et al., | AP No. 06-02227-B |
| | AP No. 06-02228 |
| Plaintiffs, | |
| v. | **TRIAL BRIEF** |
| Ponce Nicasio Broadcasting, Inc. et al., | **Trial Date: August 26, 2009** |
| Defendants. | **Time: 9:30 a.m.** |
| | **Judge: Honorable Judge David E. Russell** |
| | **Place: Courtroom 32** |

BRUCE FOX ("Fox" or "Plaintiff"), by and through counsel, the Law Offices of Todd A. Murray, hereby submits his Trial Brief as follows:

/ / /

/ / /

/ / /

/ / /

/ / /

# I.

## INTRODUCTION

These actions are actually straightforward. Plaintiff Bruce Fox has filed the two instant adversary proceedings[1] as assignee of the bankruptcy trustee in two bankruptcy actions. They are actions to avoid numerous improper distributions to certain company insiders made while the subject companies were insolvent and made with the intent to defraud its major creditor, Plaintiff Bruce Fox.

The Briggs family has been on a fourteen-year quest to avoid the legitimate obligations they owe to Bruce Fox. They have brought multiple lawsuits, filed innumerable motions, appealed court judgments and placed their legal entities in bankruptcy; all as part of a concerted effort to avoid paying Plaintiff Bruce Fox. During this time, Defendants sold the Debtors' only significant asset (KCMY/Channel 29) and, with full knowledge of an obligation of over $700,000 owed to Bruce Fox, they distributed to themselves or otherwise dissipated some $17,725,000 through a series of questionable maneuvers, all the while leaving Fox unpaid. Fox now has his last remaining opportunity to collect his just obligation through these cases to avoid the fraudulent distributions taken by the remaining defendants, Ronald V. Briggs, RJ Briggs and Brian Briggs, ("Defendants") after the entities were clearly insolvent.

# II.

## PROCEDURAL BACKGROUND

As more fully explained in the relevant Appellate Decision, attached hereto, the patriarch of the Briggs clan, John Briggs, a former state senator, managed to obtain a television license to operate Channel 29 serving the Sacramento area. As part of the application process, John Briggs initially set up a limited partnership known as Ponce Nicasio Broadcasting, LP ("PNB LP"), to hold the license. There were several limited partners and over time, the Defendants, through various maneuvers, all became purported limited partners. He also set up a corporation known as Ponce Nicasio Broadcasting, Inc., ("PNB, Inc.") (Both entities sometimes collectively referred to as "Ponce"), to serve as the general partner of the limited partnership. By

1    setting up his wife, Carmen as the President and purported owner, John Briggs was able to

2    obtain "minority owner status," and win the application bidding process. However, as stated by

3    the Appellate Court, Carmen did not have a truly active role and merely "did his bidding." The

4    license was given by the government to Ponce for free and the Briggs' merely had to invest

5    funds to get on the air.

6          Despite their small investment, because of changes in the cable TV market in the mid-

7    1990's, this small station became a very valuable commodity. Fox, then a media broker with a

8    company known as Media One, approached John Briggs and explained how he could take

9    advantage of the new market for stations such as his.

10         As later confirmed by a jury, by El Dorado County Superior Court Judge Finney and by

11   the Third District Court of Appeals, Fox then helped Ponce get out of a detrimental contract and

12   procured a buyer for the station in a large entity known as Paxson Communications ("Paxson").

13   Because of Fox, the debtors were able to effectively lease the station to Paxson commencing in

14   1996 and to enter into an option agreement to sell the station for $17,000,000.00. In 2000 Ponce

15   did sell the station to Paxson, for some $17,725,000, all as a proximate result of Fox's original

16   efforts.

17         Earlier, in what was to become a pattern, Ponce refused to honor their brokerage contract

18   with Fox and instead filed suit against him in state court in 1996, asking for a declaration that

19   Fox was owed no money. Fox counter sued. Ponce lost. In early 1998, an El Dorado County jury

20   found that Fox was the procuring cause of the Paxson deal and awarded him a three percent

21   commission on all monies Ponce had collected from Paxson up to that date. El Dorado County

22   Superior Court Judge Terrence Finney then awarded a declaratory judgment, confirming the

23   jury's finding and ruling that Fox would be entitled to three percent (3%) commission on the sale

24   price if Paxson ultimately bought the station.

25

26

27

28   [i] Although there are two separate bankruptcies and two separate adversary proceedings. The Court has combined the two trials as the issues are essentially identical.

1  Ponce appealed. Ponce lost. The California Court of Appeal upheld the verdict in April

2  2000. At that time, Ponce paid only for Fox's commission on the original jury verdict for the

3  lease payments and has never paid any more.

4  In the meantime, when Paxson attempted to exercise their option in June of 1998, Ponce

5  took the position that **Paxson** should pay the commission owed to Fox and that if they did not do

6  so, they would not sell to Paxson. Litigation commenced in the Eastern District of United States

7  District Court. Ironically, because of the increasing value of the station, Paxson gave in and

8  settled. Paxson agreed to pay the additional amount demanded by Ponce, giving them an

9  additional $725,000, with which to pay Fox's claims and Ponce's related litigation expenses.

10  In June of 2000, having lost the Fox appeal, but having settled their suit with Paxson and

11  obtained the money necessary to pay Fox, Ponce closed escrow on the station and received

12  $17,725,000, including the $725,000 increase over the original option price to cover Fox.

13  However, Ponce failed to pay Fox, or even inform him that the sale had closed. Instead, when

14  Fox commenced collection efforts, Ponce took the position that their June, 2000 transaction with

15  Paxson was **not** the transaction on which Fox was declared to be owed a commission, arguing

16  that the terms were different than under the original agreement. Ponce then filed a motion under

17  Section 724.050 of the Code of Civil Procedure for a determination that they had completely

18  satisfied Fox's judgment and they owed him no money. Ponce lost.

19  Fox was also forced to file a complaint to collect other monies owed on the ongoing lease

20  payments Ponce had received from Paxson since the time of the original judgment and Ponce

21  fought this. Ponce lost. In a combined hearing and trial, again before Judge Finney, it was

22  confirmed that Fox was owed a commission on the monies collected by Ponce for the interim

23  lease payments and for the sale to Paxson. In a ruling dated July 25, 2003, Judge Finney

24  confirmed the obvious: The entities still owed Fox $531,750.00 (3% of the $7,725,000), plus

25  interest at 10% from June 1, 2000, on the sale. And they owed him another $77,350.00, plus

26  interest, for his commissions earned on the ongoing lease payments collected by Ponce since the

27  first trial. The combined total, with interest, exceeded $750,000.00.

28

1    At that point, instead of paying Fox, the Briggs claimed they had no assets and caused

2    both of the entities, PNB Inc and PNB LP, to file bankruptcy in June of 2004. The defendants

3    then filed a declaratory relief action (since dismissed) seeking a declaration that they did nothing

4    wrong.

5        When it was determined that the Defendants had, starting in 2000, committed a series of

6    fraudulent transfers by distributing all of the money to themselves, disbanding the legal entities

7    and making no reasonable reservation of funds to pay Fox, Fox obtained the trustee's charging

8    rights and brought this action to avoid the fraudulent transfers under the applicable state laws. In

9    a summary judgment motion, most of the original defendants were dismissed because it was

10   found that as a part of the distributions of the entities' assets to them in August of 2000, they had

11   left behind with the Defendants their prorated share of $700,000 to cover the Fox obligation.

12   However, the remaining Defendants dissipated even these monies and, after considerable

13   procedural obstruction, the matter is now going to trial against these three remaining Defendants

14   to force them to repay the improper and fraudulent distributions they took from the entities after

15   the entities were insolvent.

16                                    **III.**

17                          **DISPUTED TRANSFERS**

18       Under both California Civil Code Sections 3439.04 and 3439.05, Fox is

19   seeking to avoid a number of transfers from the entities to Defendants, that occurred after his

20   claims arose and after the entities were insolvent.

21       In total, the Defendants received distributions from the Paxson sale proceeds after June of

22   2000 that totaled in excess of $3,000,000. This was well after the 1998 trial where the court had

23   issued its judgment holding that the entities were liable to Fox for three (3%) of the proceeds of

24   the sale to Paxson. Plaintiff believes all of those distributions were improper, however the Ponce

25   entities were arguably solvent when some of those distributions were made.

26       However, after September of 2001, neither Ponce entity was solvent, in that their total

27   assets were exceeded by the obligation owed to Fox. As a result, all distributions made by Ponce

28

1  to the Defendants after that date must be avoided and returned to the trust estates. The total of
2  such distributions will be shown to be in excess of $700,000.

3      These distributions were taken without the entities receiving reasonably equivalent value
4  in exchange and were simply transfers to the Defendants made whenever they wanted money.
5  Some of the distributions were in the form of stock and some were in cash. While some are
6  apparent, some were well hidden in the poor records of the entities. All must be avoided and the
7  creditors, including Fox, properly paid.

8
9                                    **IV.**
10                            **LEGAL ISSUES**
11      **A. Transfers Should Be Avoided Pursuant to Trustee's Avoiding Powers Partners'**
12  **Liability**
13      Liability on the Defendants, who were limited partners of PNB, LP and apparently
14  shareholders of PNB, Inc., is premised upon their receipt of avoidable transfers. The fact that
15  these individuals were insiders, among other factors, is the basis for Plaintiff's claims against
16  them.

17              **1. California's Uniform Fraudulent Transfer Act**
18      11 U.S.C. section 544(b)(1) reads in relevant part as follows:
19      . . . , the trustee may avoid any transfer of an interest of the debtor in property or any
20  obligation incurred by the debtor that is voidable under applicable law . . . .
21      California Code of Civil Procedure section 3439.04 provides in pertinent part:
22              (a) A transfer made or obligation incurred by a debtor is fraudulent as to a
23  creditor, whether the creditor's claim arose before or after the transfer was made or the obligation
24  was incurred, if the debtor made the transfer or incurred the obligation as follows:
25              (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.
26              (2) Without receiving a reasonably equivalent value in exchange for the transfer
27  or obligation, and the debtor either:
28

1             (A) Was engaged or was about to engage in a business or a transaction for which

2 the remaining assets of the debtor were unreasonably small in relation to the business or

3 transaction.

4             (B) Intended to incur, or believed or reasonably should have believed that he or

5 she would incur, debts beyond his or her ability to pay as they became due.

6            (b) In determining actual intent under paragraph (1) of subdivision (a),

7 consideration may be given, among other factors, to any or all of the following:

8             (1) Whether the transfer or obligation was to an insider.

9    . . .

10            (4) Whether before the transfer was made or obligation was incurred, the debtor

11 had been sued or threatened with suit.

12    . . .

13            (9) Whether the debtor was insolvent or became insolvent shortly after the

14 transfer was made or the obligation incurred.

15    California Civil Code § 3439.05 states that "a transfer made or obligation incurred by a

16 debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the

17 obligation was incurred if the debtor made the transfer or incurred the obligation without

18 receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor

19 was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

20           **2. There Are Sufficient Facts to Support a Finding that Transfers were made**

21              **with Actual Intent to Hinder, Delay, or Defraud Fox**

22    The "question of fraudulent intent in conveying property is one of fact to be determined

23 by trial court." *Knapp v. Elliott* (1947) 81 Cal App 2d 667, 184 P 2d 934, 1947. Whether

24 transfers of property were made to hinder, delay, or defraud creditors so as to be fraudulent under

25 CC § 3439.07 (current CC § 3439.04), is an issue of fact, its proof is peculiarly dependent upon

26 the circumstances which surround the questioned transaction, and the inferences which the trier

27 of fact may reasonably draw therefrom. *Bulmash v. Davis* (1979) 24 Cal 3d 691, 157 Cal Rptr

28 66, 597 P2d 469.

1

### a. The Defendants are All Insiders For Purposes of the Statute

2      A transfer made with the intent to defraud a creditor is fraudulent as to any creditor

3   regardless of whether the debtor was insolvent at the time of the transfer. *In re Cohen*, 199 B.R.

4   709 (9th Cir. BAP 1999); *In re Liquimatic Systems, Inc.*, 194 F.Supp. 625 (S.D. Ca. 1961); *Slater*

5   *v. Bielsky*, 183 Cal.App.2d 523 (1960); *Johns v. Baender*, 40 Cal.App. 790 (1919). A

6   relationship among insiders, when coupled with other suspicious circumstances, gives rise to an

7   inference of fraud for purposes of California's fraudulent transfer statute. Accordingly, in such

8   cases, the parties are held to a higher standard of proof of the consideration and the fairness of

9   the transaction. *In re Serrato* 214 B.R. 219 (Bktcy. N.D. Ca. 1997).

10          **b. Before the Transfers Were Made, Debtors Had Been Sued and a Judgment**

11              **Had Been Obtained Against Debtors**

12      The Defendants knew that Fox was a creditor when the television station was sold and

13   the transfers to the insider-limited partners were made. The amended, entered on May 29, 1998,

14   states in part as follows:

15      *NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED:*
       *That cross-complainant, Bruce E. Fox, dba Fox Media have judgment against cross-*
16   *defendant Ponce-Nicasio Broadcasting, Inc., and Ponce-Nicasio Broadcasting Partnership in*
     *the amount of $91,883,000 with interest thereon as allowed by law, and costs of suit which shall*
17   *be set out in a memorandum of costs which shall be submitted to the court by counsel for cross-*
     *complainant; and further that cross-complainant Bruce E. Fox, dba Fox Media, have judgment*
18   *against cross-defendant Ponce-Nicasio Broadcasting, Inc. and Ponce-Nicasio Broadcasting*
     *Partnership that Bruce E. Fox, dba Fox Media, is entitled to, and shall have, a three percent*
19   *(3%) commission from cross-defendant Ponce Nicasio Broadcasting Partnership at such time as*
     *Ponce-Nicasio Broadcasting Partnership sells television station KCMYTV/Channel 29 to a*
20   *Paxon Communications entity, including, but not limited to, Paxon Communications of*
     *Sacramento 29, Inc., under the September 6, 1996 Option Agreement.*
21

22

23      The court's judgment was upheld by the Appellate Court in a decision filed on April 17,

24   2000. Further, as noted above, after the transfers were made to the insider limited partners, and

25   the Debtors purportedly established a reserve account for the Fox litigation. It is undeniable that

26   the Defendants considered Fox a creditor of the Defendants when the television station was sold

27   and the transfers to the insider limited partners occurred. The amended judgment and appellate

28   decisions are clear and the Defendants actions confirm this.

1 | Despite this, and with the knowledge of Plaintiff's claims, Defendants took funds from
2 | the entities after they were insolvent.

### CONCLUSION

4 | As indicted, the Briggs family has taken the position that they do not owe Plaintiff Bruce
5 | Fox any money as a result of his assistance in making them some $17,725,000. This belief has
6 | continued in the face of a jury verdict, multiple trial court rulings, and an appellate court
7 | decision. Because of this belief, the Defendants took distributions in excess of $700,000.00 from
8 | their entities, despite the fact that they were aware of the Fox claims and despite the fact that the
9 | entities no longer had the assets to meet their obligations. Pursuant to clear and well-established
10 | law, these fraudulent transfers must be avoided and the funds must be returned to the bankruptcy
11 | estates.

DATED: August 24, 2009       LAW OFFICES OF TODD A. MURRAY

By:    /s/_____
Todd A. Murray
Attorney for Plaintiff BRUCE FOX

NOT TO BE PUBLISHED

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)
----

MEDIA ONE, INC., et al.,

      Cross-Complainants
      and Respondents.

  v.

PONCE-NICASIO BROADCASTING, INC.,
et al.,

      Cross-defendants and
      Appellants,

---

PONCE-NICASIO BROADCASTING, INC.,
et. al.

      Plaintiffs and Appellants,

  v.

MEDIA ONE, INC., et al.,

      Defendants and Respondents.

C029163
(Super. Ct. No. PV002097)

**FILED**

APR 17 2000

COURT OF APPEAL-THIRD DISTRICT
ROBERT L. LISTON, Clerk
BY_____Deputy

C030609
(Super. Ct. No. PV002097)

 

In this case, we uphold a jury verdict finding a broker earned his commissions. Substantial evidence supports the jury's conclusion that Bruce Fox was the "procuring cause" of the

1

agreements and transactions that are the subject of this litigation.

I.

Ponce-Nicasio Broadcasting and others (Ponce) sought a declaration it owed no commissions to Bruce Fox and others (Fox) in connection with a business brokerage agreement. Fox answered and cross-complained, seeking a contrary declaration and damages.

Ponce unsuccessfully moved for summary judgment. The case went to trial, but a mistrial was declared. Ponce (with new counsel) filed an amended complaint, detailing Ponce's claims. Specifically, Ponce sought a declaration it did not owe Fox commissions as a result of (1) an "Affiliation Agreement," made May 26, 1995; (2) a "Time Brokerage Agreement," made September 6, 1996; and (3) an "Option Agreement," also dated September 6, 1996. Ponce again unsuccessfully moved for summary judgment. Ponce lost at trial.

The jury answered three questions, finding Fox was entitled to a commission of $38,333 for the affiliation agreement, a commission of $53,550 for the time brokerage agreement, and to a commission if Ponce exercises the option agreement. The dollar awards amounted to three percent of the amounts Ponce received pursuant to the first two agreements, as of March 20, 1998.

A judgment on special verdict was entered. After Ponce filed a notice of appeal, Fox asked the trial court to amend the judgment to address the declaratory relief claim. The trial

2

court did so and denied Ponce's subsequent motion to vacate.
Ponce filed a notice of appeal from the denial of the motion to
vacate the amended judgment. We consolidated the appeals.

We shall dismiss the appeal from the initial purported
"judgment" and affirm the amended judgment.

II.

Much of the case turns on evidentiary points. "Under the
often-enunciated rule, which is so often forgotten in the
enthusiasm of advocacy, we look to the evidence accepted by the
trial court." (*Findleton v. Taylor* (1962) 208 Cal.App.2d 651,
652.) "[I]n examining the sufficiency of the evidence to support
a questioned finding, an appellate court must accept as true all
evidence tending to establish the correctness of the finding as
made, taking into account, as well, all inferences which might
reasonably have been thought by the trial court to lead to the
same conclusion. Every substantial conflict in the testimony is,
under the rule which has always prevailed in this court, to be
resolved in favor of the finding." (*Bancroft-Whitney Co. v.
McHugh* (1913) 166 Cal. 140, 142; see *Overton v. Vita-Food Corp.*
(1949) 94 Cal.App.2d 367, 370.)

Although Ponce's statement of facts is unduly partisan, the
transgressions are not so pervasive as to lead us to declare its
evidentiary contentions waived. (*Foreman & Clark Corp. v. Fallon*
(1971) 3 Cal.3d 875, 881.)

3

Fox is a media broker who worked with a more experienced man (Woods) in a company called MediaOne at the time he contacted. Ponce. MediaOne later assigned any rights regarding Ponce to Fox.

Ponce owns a television station in Placerville which broadcasts on Channel 29, formerly known by the call letters KCMY. At the relevant times the company was controlled by John Briggs (Briggs). Although Briggs claimed to be but a "consultant," the other members of the company were his wife and sons who, it appears, did his bidding. For example, although much of the correspondence went out under the signature of Carmen Briggs, the president of Ponce and the wife of Briggs, the testimony shows she lacked business experience and signed letters Briggs wrote. In contrast, Briggs had business experience and was a former state senator. A Ponce fact sheet introduced at trial touts the station as a "minority/female Hispanic owned and controlled" business, because of Carmen's status as president and her ownership interest.

Channel 29 was burdened by an agreement with Home Shopping Network, which controlled almost all the air time. It would not expire until August 1997.

Fox proposed to try to sell the station. Fox talked to Briggs about changes in the industry, whereby "marginal" stations were increasing in value because "must carry" laws required cable companies to carry the signals of small stations; hence, all

4

local cable subscribers would be able to view the station.
Further, there were various ways to transfer control of a station
and avoid FCC rules prohibiting ownership of multiple stations in
one area. By letter dated February 16, 1994, Ponce agreed Fox
should act as a nonexclusive broker for 90 days. If Fox arranged
a sale within six months of the expiration of the listing, he
would earn a three percent commission. Pursuant to this
agreement, Fox "registered" several prospects, including, "Paxson
Communications (Lowell 'Bud' Paxson)." This listing expired by
its terms.

Bud Paxson, formerly the head of Home Shopping Network, had
created a large media company, Paxson Communications. When he ·
(or his company) buys a station, it is purchased in the name of a
separate subsidiary for each station. ; signals its interest

· A Paxson company named Rogers Media of California, Inc.,
signaled its interest in buying the station for $9 million plus a
valuable tax certificate, which could be used to defer capital
gains taxes. Fox sent a new listing agreement to Ponce, dated
November 18, 1994. It states in pertinent part: "MediaOne will
act as a non-exclusive broker for the purpose of arranging an
acceptable sale or business transaction of this Station.
MediaOne has identified and has previously registered the
following potential purchasers: . . . [¶] . . . [¶] 4) Paxson
Communications [¶] 5) *Rogers Media of California, Inc.* [¶] If
MediaOne is successful in bringing about a transaction for you on

this Station the MediaOne fee will be 3% of the total sales consideration to be paid in cash at the closing of the transaction. *Such fee, at KCMY's option, shall be paid by Buyer."* The portions we have italicized were added by Ponce before the agreement was signed and returned to Fox. Fox testified Briggs told him this was for tax reasons, in case it would be better to construct the transaction so the fee would come from the buyer. The listing expresses no expiration date.

Fox knew Briggs was adverse to paying taxes if they could be avoided and, hence, might value the tax certificate, because the Briggs family had a low cost basis in the station. However, Ponce declined the offer from Rogers Media. Fox then arranged to have James Bocock, President of Paxson Communications, fly to Sacramento and try to change Ponce's mind about the deal.

Fox also knew the station would be less valuable to Paxson so long as the Home Shopping Network agreement was in effect. However, Paxson and Fox discussed a plan to induce Home Shopping Network to drop the agreement and Fox told Briggs about it. nstead of surrendering unused air time, the station could sell infomercials to be aired in the time not controlled by the network. If Ponce would do this, it might anger the network and induce it to lower the hourly rates paid to the station. The network had the right to do this under the affiliation contract, but doing so would trigger a provision of the contract (which

6

Bocock had drafted when he was employed by Home Shopping Network)
allowing the station to cancel the agreement.

By letter dated April 28, 1995, Home Shopping Network sent
Ponce a letter drastically reducing its hourly rates, in response
to Ponce's airing of the infomercials.

Meanwhile, Paxson had hit upon the idea of the Infomall TV
Network to market long-form infomercials. Ponce claimed it did
not learn of this idea until April, 1995, when Briggs went to a
convention and picked up a flyer about it. However, the flyer
produced by Briggs is dated January 18, 1995. Ponce claimed it
was not until receiving the letter from Home Shopping Network —
out of the blue — that it was interested in exploring a deal with
Infomall. But in his deposition Briggs seemed uncertain whether
the agreement preceded or followed the Home Shopping Network
letter.

By March 1995, Fox suspected Briggs and Paxson were planning
to cut him out of some kind of deal. Briggs was evasive on the
telephone and finally said if the station *sold* he would be paid,
and by implication he, Fox, would not be paid for anything less
than a sale. Briggs made it clear he did not want Fox to keep
working for Ponce. When Fox called Paxson to talk about this,
Paxson said the matter was not his concern. Fox did not want to
kill whatever deal was in the works. He also had other,
unrelated, deals pending with Paxson and did not want to sour his

7

relationship with Paxson. Accordingly, he bided his time to let the parties negotiate themselves.

Ultimately, Ponce signed the affiliation agreement with Infomall, dated May 26, 1995, which gave Infomall the right to program 10 hours each day of the station's time.

Ponce also signed a deal with KXTV, Channel 10 for certain programming in June 1995. Channel 10 had the right of first "negotiation" "towards a definitive acquisition agreement or LMA." An "LMA" is a local marketing agreement, which essentially allows one station to air programming from another. The agreement did not allow Ponce to "solicit from, enter into discussions with, or provide information to, any third party relating to any (i) sale of the Station, (ii) merger or consolidation involving the Station, (iii) LMA involving the Station, or (iv) other agreement having a material effect upon the ownership or operation of the Station or its assets." At the time, it was thought the law might be changed to allow a single entity to own multiple stations in a given market. That did not occur.

On September 5, 1995, Ponce sent two letters to Channel 10. One, addressed to the President and General Manager, invited negotiations toward an LMA. However, the other, sent to the station manager, informed Channel 10 "KCMY has decided to reduce the midday KXTV news replay over Channel 29 to a one half hour segment only." Thus, although nominally inviting negotiations,

8

the invitation was accompanied by a sort of a threat, namely, that KCMY was not interested in Channel 10's programming.

Channel 10 sent a letter to Ponce dated October 4, 1995, setting forth Ponce's position it would not "have any interest in an LMA arrangement that would provide you with less than 3.6 million dollars annually." At the time, Ponce was only making about $1.2 million from the station. The letter also states "We were very disappointed to learn of your agreement with Info Mall. [Sic.] With limited detailed information, it seems to us that this agreement severely restricts our abilities to operate the station in the ways that would fit within our long-term plans," and asks Ponce to forward more information about the agreement with InfoMall. Fox argued to the jury the deal with Infomall breached the Channel 10/Channel 29 agreement requiring first negotiations to be conducted with Channel 10. This advanced Fox's claim the Channel 10 deal was never going to result in a sale or further affiliation, but was a blind to disguise the dealings between Paxson and Ponce. Ponce claimed Channel 10 knew about it all along. But it also claimed the agreement was not "material" and, hence, did not have to be mentioned.

In September 1996, Ponce entered into a time brokerage agreement — "tantamount to a lease" according to Ponce, which ceded programming control to Paxson (subject to Ponce's duties as holder of the FCC license), and into a put-call option agreement, whereby either Paxson could forcibly purchase or Ponce could

9

forcibly sell the station. At the same time, Paxson "loaned" Ponce $8.5 million. In the 1996 Paxson annual report, KCMY is listed as a station "owned or operated" by Paxson, with a note stating "the Company has an option to acquire a 100% ownership interest.". The "loan" to Ponce is categorized under "investments in Broadcast Properties," which explains "Unpaid principal balances will be applied toward the acquisition cost upon exercise of purchase options." The "Investment Amount" is given as $8,549,583. Later in the report, a note states, "[t]he Company has loaned an aggregate of $8,500,000 to KCMY-TV and began operating the station pursuant to a time brokerage agreement on October 1, 1996 pending completion of the acquisition of the station. The loan amount of $8,500,000 will be applied to the purchase price [of $17,000,000]."

The station as changed now contains "PX" as part of its call letters (KSPX), to reflect it is part of Paxson's network, PaxNet.

Ponce's case was based largely on the theory the April 1995 letter from Home Shopping Network was unexpected and caused Ponce to scramble to find replacement programming. Ponce argued it entered into all of the other agreements without assistance from Fox. Because Briggs already knew Paxson, Fox's "introduction" of the parties was of no real value to Ponce. However, Dan Briggs, the general manager, testified the family had a standing offer from Paxson, but this fact did not mean a broker would not be

entitled to an earned commission on a sale to Paxson. Ponce tried to prove it terminated Fox, by a letter dated December 28, 1994, but Fox and Woods denied receiving any such letter.

## III.

A large measure of the appeal is devoted to a dispute about the "procuring cause" doctrine. As the name suggests, it is a particular application of causation rules, which addresses when an agent employed by one party can be said to have "caused" a transaction, by "procuring" the other party.

Generally, "An agent whose compensation is conditional upon his accomplishment of a specified result is entitled to the agreed compensation if, and only if, he is the effective cause of accomplishing the result." (Rest.2d Agency, § 448, Agent vs. Principal (1958) p. 355.) "An agent is an 'effective cause,' as that phrase is used in this Section, when his efforts have been sufficiently important in achieving a result for the accomplishment of which the principal has promised to pay him, so that it is just that the principal should pay the promised compensation to him." (Id., com. a, p. 355.) "If a person employs only one broker to procure a customer, the broker is ordinarily entitled to his commission, under the rule stated in this Section, if he causes a customer to negotiate with the principal and the customer makes a purchase *without a substantial break in the ensuing negotiations.*" (Id., com. d, p. 357, italics added; see *Oaks v. Brahs* (1955) 132 Cal.App.2d 182, 184;

11

*Roth* v. *Thomson* (1919) 40 Cal.App. 208, 215; *Holton* v. *Shepard* (1935) 291 Mass. 513, 516 [197 N.E. 460, 462].) "Thus, the test is one of 'fairness,' and the question is one of fact for the jury." (*Willson* v. *Turner Resilient Floors* (1949) 89 Cal.App.2d 589, 596; Rest.2d Agency, *supra*, § 448, com. c., p. 356.)

Merely introducing the parties usually is not enough. (*Tetrick* v. *Sloan* (1959) 170 Cal.App.2d 540, 544-545; *Neiswender* v. *Campbell* (1932) 119 Cal.App. 504, 506-507.) "'[T]he broker may be the means of first bringing the parties together and of opening negotiations with them, yet if the negotiations are unproductive and the parties in good faith withdraw therefrom and abandon the proposed purchase and sale, a subsequent renewal of negotiations followed by a sale at a lower price does not entitle the broker to commissions, as he cannot be said to be the procuring cause of the sale.' [Annot., Broker's Right to Commission (1956)] 46 A.L.R.2d 848, 864, 865." (*Cornet & Zeibig, Inc.* v. *430 Withers Realty Co.* (Mo. 1967) 415 S.W.2d 751, 756.)

The efforts of the broker must cause the sale, not merely precede it. This is exemplified by cases involving multiple brokers. "However nearly he may have brought him to a favorable decision, if the negotiations were broken off before a decision was reached and a final decision is brought about by another agent, the latter will be entitled to the commission." (*McCoy* v. *Zahn Corporation* (1920) 183 Cal. 191, 196-197.) "Merely putting a prospective purchaser on the track of property which is on the

12

market will not suffice to entitle the broker to the commission contracted for, and even though a broker opens negotiations for the sale of the property, he will not be entitled to a commission if he finally fails in his efforts, *without fault or interference of the owner*, to induce a prospective purchaser to buy or make an offer to buy, notwithstanding that the owner may subsequently, either personally or through the instrumentality of other brokers, sell the same property to the same individual at the price and upon the terms for which the property was originally offered for sale. [Citations.] . . . [¶] As was said in *Sibbald* v. [*Bethlehem*] *Iron Co.*, 83 N. Y. 378, [38 Am. Rep. 441]: 'A broker may have created impressions which under later and more favorable circumstances naturally lead to and materially assist in the consummation of a sale. He may have planted the very seeds from which others reap the harvest. But all that gives him no claim. It was part of his risk that failing himself, not successful in fulfilling his obligations, others might be left to some extent to avail themselves of the fruits of his labors.'" (*Cone v. Keil* (1912) 18 Cal.App. 675, 679-680, italics added.)

As suggested by the passage we have italicized in the preceding quotation, the seller cannot defeat the right to a commission by interference or other misconduct. (See *Zeimer v. Antisell* (1888) 75 Cal. 509, 511-512 [referring to "negligence, fault or fraud of the owner" as excusing broker's failure to consummate sale] citing, *inter alia*, *Fultz v. Wimer* (1886) 34

13

Kan. 576 [9 P. 316, 319]; see *Brea v. McGlashan* (1934) 3 Cal.App.2d 454, 465 ["The word 'procure' does not necessarily imply the formal consummation of an agreement. The Century Dictionary gives the following as the meanings of the word: 'To bring about by care and pains; effect; contrive and effect; induce; cause, as he procured a law to be passed.' In its broadest sense, the word means to prevail upon, induce or persuade a person to do something. . . . [I]f an agent (or broker) is the inducing or procuring cause of the contract, he is entitled to the commission, *even though the principal takes it out of his own hand and completes it*]. (Italics added.)

(*Chamberlain v. Abeles* (1948) 88 Cal.App.2d 291, 296-297.)

"Although it is not sufficient that the broker has merely planted the seed from which the harvest was reaped" [citation], "on the . . . other hand the owner cannot take advantage of a broker's services and make the sale himself, or through another broker, so as to deprive the broker of his commission when he has introduced a prospective buyer to the seller and negotiations have progressed to a point where success seems imminent. [Citations.]" (*Sanders v. Devereux* (1963) 231 Md. 224, 231-232 [189 A.2d 604, 608]; see *id.* at pp. 233-234 [189 A.2d at pp. 609-610 ["freezing of the [broker] out of further negotiations"]; *Wilson v. Roppolo* (1962) 207 Cal.App.2d 280-281 ["Particularly . . . where the seller takes the negotiating away from the broker and conceals that fact"]; *Roger Coleman Associates, Inc. v. Retsof Company Trust*

14

(1977) 117 N.H. 81, 84 [369 A.2d 1143, 1145] ["The jury could find that the sale was not completed solely because of the action of the seller in failing to pay the agreed commission."]; *Ratts v. Shepherd* (1887) 14 P. 496, 497 [37 Kan. 20] ["it would seem as if the delay in closing the sale was caused by the negligence or fault of [seller], who no doubt acted with the idea that if the sale was not consummated by the first day of March the commission due the defendants in error would not have to be paid."].)

Ponce contends California law allows a principal to cut a broker off. It points to Civil Code section 1086, subdivision (f)(3), which provides: "An 'open listing' is a listing which grants no exclusive rights or priorities to the listing agent, and *a commission is payable to the agent only if the agent procures and presents to the owner an enforceable offer* from a ready, able, and willing buyer on the terms authorized by the listing or accepted by the owner, before the property is otherwise sold either through another agent or by the owner directly and before the listing expires by its terms or is revoked." (Italics added.) Ponce also points out the California Supreme Court has quoted a treatise in a footnote for the following proposition: "'A broker is the "procuring cause" of a real estate transaction if he finds a purchaser who is ready, willing, and able to buy the property on the terms stated and he obtains a valid contract obligating the purchaser on these terms. If the broker cannot secure a written offer from the purchaser,

15

he is still considered as the "procuring cause" if he brings the principal and the purchaser together so that they may enter into such a contract. In other words, if the broker's efforts result in a "meeting of the minds" between the buyer and the seller but the final negotiations and the conclusion of the sale are conducted by them without the aid of the broker, he will still earn his commission.' [Citations.]. 'Whether the broker was the "procuring cause" and the "motivating force" of the sale is a question of fact to be determined from all of the circumstances surrounding each specific case.' [Citations.]" (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 820-821, fn. 2, disapproved on other grounds by *Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376.) The last sentence of the quotation, emphasizing the fact-specific nature of the inquiry, is omitted from Ponce's brief.

But nothing in the statute or in *Buckaloo* v. *Johnson*, *supra*, 14 Cal.3d 815 (or *Phillippe* v. *Shapell Industries* (1987) 43 Cal.3d 1247, 1263, fn. 11, reiterating *Buckaloo* and also cited by Ponce) supports Ponce's conclusion the statute changed the common law (and common sense) rule of agency explained above, stating a principal cannot deprive an agent of the benefit of the agency contract by freezing him out and reaping the benefits of his work. (See, e.g., *Zeimer* v. *Antisell*, *supra*, 75 Cal. at pp. 511-512 ["negligence, fault or fraud of the owner."]; *Ratts* v. *Shepherd*, *supra*, 14 P. at p. 497 [37 Kan. 20]; and see Civ. Code,

§§ 3512 ["One must not change his purpose to the injury of
another."], 3517 ["No one can take advantage of his own
wrong."].) We reject Ponce's interpretation of the statute and
case law as excluding the possibility of a commission except
where the broker has physically brought the later-consummated
offer to the table. The statute itself merely declares the
different types of listings, and does not purport to define the
entire body of agency law. (See Civ. Code, § 1086, subd. (f) ["A
listing may be any of the following: [¶] (1) An 'exclusive right
to sell listing' . . . . [¶] (2) An 'exclusive agency listing'
. . . . [¶] (3) An 'open listing' . . . .) Generally speaking,
an "open listing" does require the agent to bring an enforceable
offer within the period of the listing, as the statute states.
We simply disagree with Ponce's view the statute also serves to
cut off an agent's ability to recoup earned compensation in
circumstances of conduct by the principal which deprives the
agent of the ability to complete his mission after having found
compatible parties to a transaction and after having set a "deal"
in motion.

IV.

Ponce contends Fox was not entitled to a commission. In
partly legal and partly factual claims, Ponce claims the jury
verdict is wrong, because Fox was not the "procuring cause" of
the contracts, because Ponce terminated the contract, and because
the contract did not itself compel the payment of a commission.

17

We disagree with these contentions. Accordingly, we need not address Fox's contention the listing was "exclusive," notwithstanding it says it is "non-exclusive."

A.

Sufficient evidence supports the jury's conclusion Fox was the "procuring" cause of the agreements. Contrary to Ponce's claim, Fox does not rely on his efforts in bringing the Rogers Media offer and "introducing" the parties as the only bases for his claim. He did much more. He applied his professional knowledge of the industry and his knowledge of Paxson's needs and Ponce's needs. Not only did he have particular knowledge which showed Paxson and Ponce made a good "match," i.e., that each met the other's needs, he strategized with Paxson to help eliminate the Home Shopping Network "cloud" over KCMY's programming. (See *Rossini & Smith Companies, Inc. v. Locke* (1995) 139 N.H. 572, 574 [660 A.2d 1088, 1090] [broker "involved in the formation of the strategy used to approach" other buyer].) On this evidence, we will not disturb the jury's implicit finding there was no break in the continuity between Fox's efforts and the deals done.

Ponce tried but failed to prove a "break" in the causal chain. Ponce's primary effort was to claim the Home Shopping Network letter created panic and generated Ponce's interest in dealing with Paxson. But the jury could find Fox helped create the ploy which induced the letter, which was welcomed by Ponce as an "escape" from the Home Shopping Network contract. Ponce also

18

urged John Brigg's unexpected health problems, revealed in March 1996, caused the family to consider a sale of the station and broke the causal chain. But as Fox argued, this claim was cast into doubt by the fact Carmen Briggs did not even recall her husband's illness when asked what caused the family to change its mind.

Ponce misunderstands the significance of certain evidence relied on by Fox. Fox points to a portion of the transcript in which Fox testified he spoke with Briggs, who assured him the commission would be paid if a sale occurred. In the reply brief, Ponce asserts this was insufficient effort to satisfy Fox's duty of performance. But Fox cited the passage to show Ponce's recognition of the obligation to pay a commission, notwithstanding its claim to have "terminated" defendant; and to explain why (at Ponce's request) Fox did no more work on the deal. Contrary to Ponce's view, the evidence was not relied on to show some sort of oral promise to pay a commission *not otherwise due.*

The fact the put-call option had not been exercised as of the time of trial does not prove anything, given the unusual facts showing Paxson wound up with control over the station and supposedly "loaned" $8.5 million to Ponce. (See *Taussig, Day & Co.* v. *Poleman* (1950) 360 Mo. 470, 477 [228 S.W.2d 722, 725] ["We think defendant takes too narrow a view of the situation and that the evidence reasonably supports a finding that at all times what

19

was contemplated was not merely purchase of bank stock but the purchase of a controlling interest in the Bank."].) In any event, Ponce is not liable for a commission as to this transaction unless the option is actually exercised.

No doubt, the jury could have gone the other way. Even the trial court said he did not know how he would have ruled on the facts. But the jury did rule and, much as Ponce attempts to reargue and reweigh facts on appeal, Ponce is stuck with the facts found by the jury.

B.

In two related contentions, Ponce argues it had the right to terminate Fox and did so, and it had the right to deal directly with Paxson. We disagree.

Ponce claimed to have terminated Fox by letter dated December 28, 1994. Both Fox and Woods denied ever seeing the letter. As Ponce seems to concede, the jury could believe Fox's version.

But Ponce also argues the telephone call between Briggs and Fox, where Fox understood he was to "back off," constituted termination of the listing, and thereafter Ponce was free to negotiate with Paxson.

As stated, Civil Code section 1086, subdivision (f)(3) defines an "open listing" as "a listing which grants no exclusive rights or priorities to the listing agent, and a commission is payable to the agent only if the agent procures and presents to

the owner an enforceable offer from a ready, able, and willing buyer on the terms authorized by the listing or accepted by the owner, *before the property is otherwise sold either through another agent or by the owner directly* and before the listing expires by its terms *or is revoked.*" (Italics added.) Ponce reads the italicized language to mean an owner has the right to beat a broker to the punch by terminating the listing and dealing with the broker's prospects directly. We disagree. The statute permits the owner to deal with other prospects found by the owner and prospects brought by other agents, and to revoke the listing — "prior to performance" (*Tetrick v. Sloan, supra,* 170 Cal.App.2d at p. 548) — but he cannot steal prospects away from the broker by freezing the broker out. Ponce's construction of the statute would turn the real estate world upside down.

C.

Ponce contends the listing contract did not require it to pay a commission. The contract, as amended by Ponce, provides the fee "at KCMY's option, shall be paid by Buyer." Ponce maintains this clause gave it the right to shift liability for the commission to the buyer. "[P]ursuant to the contract, KCMY (Appellants) had the right or liberty of choosing whether it would pay the fee or whether the buyer would pay the fee."

We agree. However, the contracts upon which suit is based fail to provide for a commission to Fox. Ponce did not exercise its option to have the buyer pay the fees, Ponce tried to deprive

21

Fox of any fee at all. No reasonable construction of the language supports this view, nor would any sensible broker agree to a contract providing a unilateral power to decline to pay an earned commission, at the whim of the principal. Although Ponce argues against a finding the language is ambiguous, at *best for Ponce*, the clause might be thought ambiguous, but in such case its meaning is clarified by extrinsic evidence introduced at trial, including evidence the clause was inserted so Ponce could benefit from the tax consequences of having the buyer technically pay the commission. No plausible construction of the clause grants Ponce the right to reap the benefit of Fox's work for *no fee*.

To the extent Ponce suggests there is *no* contract because Ponce added the "option" language to the contract presented to it by Fox, and Fox did not thereafter explicitly acknowledge the additional term by re-signing the contract, Ponce failed properly to tender the point. First, the point is not separately headed in the opening brief, but occurs in the middle of the argument regarding the meaning of the added term. (See Cal. Rules of Court, rule 15(a); *Landa v. Steinberg* (1932) 126 Cal.App. 324, 325 [waiver].) Second, the point is not fleshed out by coherent analysis. (See *People v. Gidney* (1937) 10 Cal.2d 138, 142-143 [waiver].) After setting forth hornbook law on offer and acceptance, Ponce asserts "Thus, either Fox rejected the counteroffer and there is no binding contract for a commission or

22

fee, or Fox accepted the counteroffer subject to the new terms
provided therein. Although Fox never formally accepted the
counteroffer in a writing, Fox contends (which Ponce disputes)
that Fox accepted by performance." Then Ponce makes an argument
about the added term. Ponce fails to explain *why* Fox's evidence
of performance, if believed by the jury — which it was — does not
constitute acceptance of the added term. Further, normally the
lack of Fox's express endorsement of the added term would be of
no moment. "It was an agreement in writing signed and delivered
by him to the defendant. It was accepted by defendant, and was
acted upon by both parties. This was a sufficient execution to
make the writing a binding obligation." (*Bloom* v. *Hazzard* (1894)
104 Cal. 310, 312; see *Hefferman* v. *Davis* (1914) 24 Cal.App. 295,
299-300.) For failing to explain why this case presents an
exception to the general rule, the purported contention is
waived.

V.

Ponce contends the trial court misinstructed the jury on the
definition of "procuring cause." We disagree. We observe an
appellant raising instructional error claims in a civil case has
a significant burden. "[W]e may not reverse a judgment for
'misdirection of the jury' absent a miscarriage of justice.
(Cal. Const., art. VI, § 13.) As stated in *Soule* v. *General
Motors Corp.* (1994) 8 Cal.4th 548, 580-581 [], we must evaluate
'(1) the state of the evidence, (2) the effect of other

23

instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.'" (*Buzgheia v. Leasco Sierra Grove* (1997) 60 Cal.App.4th 374, 393-394.) Ponce makes little effort to spell out its claim of prejudice. In any event, Ponce fails to show error.

Ponce first contends as follows, "the Court instructed the jury that procuring cause is 'the originating cause that ultimately leads to the conclusion of the transaction.' This is Fox's 'chain of events' argument. However, this instruction is erroneous because, to be the procuring cause, the broker must actually present a valid contract (or at least an enforceable offer) from the buyer on terms acceptable to the client. [Citations.] Introducing the parties is insufficient.. [Citation.] Simply putting the parties on the right track; or imparting information which tends to arouse interest in the buyer is also insufficient. [Citation.] [¶] Thus, this jury instruction mislead the jury."

The question is not whether one instruction fails fully to state all the elements of a legal theory; few are so all encompassing. "The instructions must be considered in their entirety, and if, as so considered, they state the law of the case fairly and clearly, then they are, as a whole, unobjectionable, even though by selecting isolated passages from single instructions they may in some respects be amenable to just criticism." (*Douglas* v. *Southern Pacific Co.* (1928) 203 Cal.

24

390, 396.) The jury was given an instruction proposed by Ponce, quoted in full as follows:

"Before a broker is entitled to a commission, he must find a party who is ready, willing and able to purchase the property on terms and conditions satisfactory and acceptable to the client. This may be accomplished by securing a written contract or offer signed by the potential purchaser on terms satisfactory and acceptable to the client. [¶] However, merely introducing the client to a party who comes to an agreement with the prospective purchaser after the termination of the listing agreement but who was not ready, willing and able to consummate the transaction during the life of the listing agreement is in itself insufficient to entitle the broker to a commission. [¶] Similarly, to constitute the procuring cause, it is not enough that the broker contributes indirectly or incidentally to the sale by imparting information which tends to arouse interest in a potential buyer. Rather, the broker must set in motion a chain of events, which, without break in their continuity, cause the buyer and seller to come to terms as a proximate result of the broker['s] activities. [¶] Merely putting a prospective purchaser on the track of property which is on the market will not suffice to entitle the broker to the commission contracted for, and even though a broker opens negotiations for the sale of the property, he will not be entitled to a commission if he finally fails in his efforts, without fault or interference of

25

the owner, to induce a prospective purchaser to buy or make an offer to buy, notwithstanding that the owner may subsequently, either personally or through another broker, sell the same property to the same individual, at the price and upon the terms which the property was originally offered for sale."

This instruction covered each of the points Ponce complains were omitted from the instructions submitted by Fox. No more was required.

Next, Ponce contends, "The Court also instructed the jury that the owner could not do anything to prevent the broker from completing the purchase, and that the owner could not conduct direct negotiations with a potential buyer introduced by the broker. Again, these are erroneous statements of the law. [¶] . . . [U]nder an open listing, unless the broker presents an acceptable offer to the owner, the owner may directly negotiate the sale with the buyer. Likewise, the owner may terminate the broker at anytime before the broker presents an enforceable offer on acceptable terms."

This argument reiterates claims we have previously rejected above. The seller may not shoulder the broker aside in mid-negotiations and deal directly with the prospect. (See part III, ante.)

VI.

Ponce contends its first and second summary judgment motions should have been granted. Ponce overlooks the nature of review

26

of the denial of a summary judgment motion on appeal following a jury verdict. As this court stated in *Waller* v. *TJD, Inc.* (1993) 12 Cal.App.4th 830, although the order denying summary judgment is *reviewable* on appeal from a judgment following trial, the complaining party must still demonstrate that denial of the motion resulted in a "miscarriage of justice" in order to obtain reversal of the verdict.

Article VI, section 13, of the California Constitution provides that a judgment cannont be set aside " . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." This is a fundamental restriction on the power of appellate courts. (See also Code Civ. Proc., § 475.) The appellant must show that without the error there was the probability of a more favorable outcome, *at the trial.* For example, even if a trial court erred in denying the motion because the opposition thereto was deficient, facts at trial may cure whatever deficiency existed in the opposition to the motion. In such circumstances, although the complaining party would have won the case had the summary judgment motion been granted, that fact alone does *not* show a miscarriage of justice. (*Waller* v. *TJD, Inc.*, *supra*, 12 Cal.App.4th at pp. 833-836.)

27

From the record before us, it appears that Ponce chose not to seek review by extraordinary writ pursuant to Code of Civil Procedure section 437c, subdivision (1).

Ponce makes no effort to explain how the denial of the summary judgment motions in this case tainted the subsequent jury trial. Accordingly, it has not satisfied its duty as an appellant to demonstrate prejudice. "Prejudice is not presumed, and the burden is on the appealing party to demonstrate that a miscarriage of justice has occurred. [Citations.]" (*Waller v. TJD, Inc., supra*, 12 Cal.App.4th at p. 833; see *Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601; *Santina v. General Petroleum Corp.* (1940) 41 Cal.App.2d 74, 77 ["Where any error is relied on for reversal, it is not sufficient for appellant to point to the error and rest there"].) Accordingly, we need not address the merits of the rulings.

## VII.

The trial judge, Judge Finney, said he would address the declaratory relief claim consistent with the jury's findings. The jury was told "You will not concern yourself with the complaint [for declaratory relief], as that is reserved to the Court for its determination."

Although Judge Finney took the verdicts, he was not available when the time came to prepare the judgment; Judge Kingsbury prepared it. The document she prepared recites the

28

jury's verdicts and awards Fox monetary damages. It does not address the claim for declaratory relief.

After Ponce filed its notice of appeal, Fox sent a letter to Judge Finney asking him to address the claim for declaratory relief. Without objection by Ponce, Judge Finney did so by issuing an amended judgment.

Although Ponce's opening brief contains references to the purported lack of notice of Fox's efforts to amend the judgment prior to the time the court acted on those efforts, Ponce heads no separate argument regarding lack of notice. Any such argument is waived. (Cal. Rules of Court, rule 15(a); *Landa* v. *Steinberg*, *supra*, 126 Cal.App. at p. 325.) In any event, the trial court was not required to credit counsel's declaration he did not receive notice of Fox's request to the trial judge. (See *People* v. *Western Meat Co.* (1910) 13 Cal.App. 539, 544.)

As relevant here, the jury verdict includes a question and answer, stating Fox is entitled to a commission if *Ponce* exercises the option with "Paxson Communications of Sacramento," and the amended judgment states Fox is entitled to a commission if Ponce sells the station to "a Paxson Communications entity." In essence, Ponce contends the trial court lacked power to amend the judgment during the pendency of the initial appeal. (See *Betz* v. *Pankow* (1993) 16 Cal.App.4th 931, 938.)

However, Code of Civil Procedure section 916, subdivision (a), states notwithstanding the stay of proceedings upon

29

perfection of the appeal, "the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order."

Judgments are parceled out at the rate of one per lawsuit. (Code Civ. Proc., § 577.) Because the document entitled "Judgment on Special Verdict" failed to address the outstanding claim for declaratory relief, it was not, despite Ponce's assumption, a "judgment," it was a nonfinal, nonappealable order entering the jury verdicts. (See *Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725, 743; see 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 19, subd. (b), p. 80 ["purported judgment that is not a final judgment at all"].) Proceeding to address the claim for declaratory relief did not alter the purported "judgment" in any way, except to supersede it in operation. We fail to see why Ponce should be able to get a windfall by his error in filing a premature notice of appeal.

Ponce states: "What is the difference between the two? First, the jury verdict provides that Fox is entitled to a commission only if Ponce exercises the right to sell Channel-29. Thus, if Ponce chooses not to exercise its right to 'put' the television station to Paxson, but Paxson exercises its right to 'call' the sale, Fox would not be entitled to a commission under [the jury verdict]. Similarly, [the verdict] provides that Fox will be entitled to a commission only if Channel-29 is sold to 'Paxson Communications of Sacramento.' Under the amended

30

judgment, Fox will be entitled to a commission [if] Channel-29 is sold to any 'Paxson Communications entity, including, but not limited to, Paxson Communications of Sacramento-29, Inc.'"

The question before the jury was whether Fox was the *procuring cause* of the option agreement. The jury found he was. It is unimportant the verdict was phrased in terms of Ponce's exercise of the "put" option and omitted reference to Paxson's exercise of the "call" option. The issue of *who* exercised the option was not before the jury. Fox was entitled to have *the trial court* properly dispose of his claim for declaratory relief. The only declaration consistent with the jury's factual finding was a declaration that upon exercise of the option agreement Fox would be entitled to a commission. The jury verdict did not somehow limit the right to a commission to the case where Ponce, but not Paxson, exercised the option. A similar result obtains regarding the declaration that the exercise of the option by any Paxson entity will trigger a commission. Although the verdict mentions one particular Paxson entity, the verdict was not intended to and did not address questions regarding Paxson's various subsidiaries. Those issues were not before the jury. Accordingly, nothing in the verdict limited the trial court's duty and ability to fashion appropriate declaratory relief based on the relevant *factual finding* of the jury, namely, Fox procured the option agreement. Based on the fact Fox did procure it, a declaration granting Fox a commission for exercise of the option

31

agreement by any Paxson entity was appropriate. The facts at trial show Paxson routinely uses various subsidiaries to acquire stations. Ponce offers no explanation of how it is prejudiced by the inclusion of other Paxson entities in the declaration.

Regardless of the claimed erroneous procedure employed to "amend" the premature judgment after the notice of appeal had been filed, the new judgment is correct. Even if there was error, there has been no "miscarriage of justice" within the meaning of the California Constitution, article VI, section 13. (See also Code Civ. Proc., § 475.)

In sum, Ponce's claim the amended judgment gives Fox "entitlement to a commission in circumstances not provided by the jury verdict" is wrong. The jury could not grant declaratory relief and did not purport to...

DISPOSITION

The appeal (C029163) from the purported judgment of March 23, 1998 is dismissed. The judgment, as amended on May 29, 1998, is affirmed (C030609). Ponce shall pay Fox's costs on appeal.

MORRISON _____, J.

We concur:

SCOTLAND _____, P.J.

CALLAHAN _____, J.

32